CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

AUG 0 8 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **STEVEN B. MILLER,** | ) | |
| Plaintiff, | ) | Case No. 2:07cv00056 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Steven B. Miller, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Miller's claims for children's disability insurance benefits, ("CDIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 401-433 and 42 U.S.C.A. §§ 1381-1383 (West 2003 & Supp. 2008).[1] Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[1]The Act allows a claimant to file an application for disability insurance benefits based on his parents' wage earnings if the child is unmarried and dependent on the wage earner and his disability begins prior to age 22. *See* 42 U.S.C.A. § 402(d) (West Supp. 2008); *see also* 20 C.F.R. § 404.350 (2008).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Miller protectively filed his applications for CDIB and SSI on or about January 14, 2005, alleging disability as of January 25, 2001, due to nerves, limited ability to read and spell, panic attacks, panic disorder with agoraphobia and major depressive disorder, severe. (Record, ("R."), at 50-53, 59-60, 272-75.) The claims were denied initially and upon reconsideration. (R. at 29-40, 276-85.) Miller then requested a hearing before an administrative law judge, ("ALJ"). (R. at 41.) The ALJ held a hearing on June 22, 2006, at which Miller was represented by counsel. (R. at 289-328.)

By decision dated September 7, 2006, the ALJ denied Miller's claims. (R. at 18-23.) The ALJ found that Miller met the nondisability insured status requirements of the Act for CDIB purposes, as set forth in § 202(d) of the Act. (R. at 22.) The ALJ also found that Miller had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ determined that the medical evidence

-2-

established that Miller's combination of borderline intellectual functioning, minimal literacy and social phobia amounted to a severe impairment. (R. at 22.) In addition, the ALJ determined that Miller's allegations regarding his limitations were not totally credible. (R. at 22.) The ALJ found that Miller retained the residual functional capacity to perform work at all exertional levels, subject to the limitations outlined in Exhibit 8F[2] and the limitations noted by Thomas Schacht, Psy. D., a medical expert who testified at the ALJ hearing. (R. at 22.) Specifically, the ALJ determined that Miller retained the residual functional capacity to perform a significant range of heavy work.[3] (R. at 23.) The ALJ also found that Miller had no past relevant work. (R. at 22.) The ALJ noted that, although Miller's exertional limitations did not allow him to perform the full range of heavy work, according to Medical-Vocational Rule 204.00, Miller was capable of performing a significant number of jobs within the national economy, including work as a general laborer at any exertional level. (R. at 23.) Therefore, the ALJ concluded that Miller was not disabled under the Act at any time through the date of the decision, and, thus, not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.350(a)(5), 404.1520(c), 416.924(c) (2008).

After the ALJ issued his decision, Miller pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 6-9.) Miller then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[2]Exhibit 8F refers to a Mental Residual Functional Capacity Assessment, which was completed by Eugenie Hamilton, Ph.D., a state agency psychologist, on April 18, 2005. (R. at 244-47.)

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008). If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 3 of 48   Pageid#: 69

stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is currently before the court on Miller's motion for summary judgment, which was filed April 21, 2008, and the Commissioner's motion for summary judgment, which was filed June 24, 2008.

## II. Facts[4]

Miller was born in 1982, (R. at 29-30, 272), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). According to the record, Miller has an eleventh grade education and was enrolled in special education classes. (R. at 63, 126-31.) Miller also has past work experience as a bagger/stocker at a grocery store, a grass cutter, a janitor and as a restaurant worker. (R. at 60-61, 297-98.) However, it should be noted that Miller's work experience is very limited.

At the hearing before the ALJ on June 22, 2006, Miller testified that he completed the eleventh grade and that he was enrolled in special education classes since the second or third grade. (R. at 289-328.) He also testified that he could not read well and that he was not a bright person. (R. at 294.) Miller explained that he kept to himself in school and that he did not talk to many people. (R. at 294.) In addition, Miller stated that he probably could not read well enough to successfully read a grocery list. (R. at 295.) He indicated that he attempted to get a general equivalency development diploma, ("GED"), but explained that he could not pass the practice exam. (R. at 296.) Miller testified that he obtained his driver's license at age

---

[4]Any facts summarized within this section not pertaining to the relevant time period are included only for clarity of the record.

16, which required him to take a test. (R. at 296.) He noted that the test was given over the telephone and that it took him three times before he passed the test. (R. at 296.) Miller stated that he drives in his hometown, but testified that he doubted that he could drive to Kingsport, Tennessee, the location of the hearing, due to problems identifying road signs and names of streets. (R. at 297.)

Miller further testified that he last worked approximately one year prior to the ALJ hearing, when he was employed by a pizza restaurant. (R. at 297.) Miller explained that he was hired to deliver pizzas, but was quickly removed from that position because he "couldn't read good enough to find the streets . . . ." (R. at 297-98.) As such, he was moved to a cooking position, which he said did not work out because he became "real nervous when [he was] around a lot of people." (R. at 298.) Miller also testified that he worked at a grocery store for a short time period. (R. at 298.) He estimated that he worked at the grocery store less than one month. (R. at 298.) He testified that he bagged groceries and indicated that his ability to stock was limited. (R. at 298.) Miller acknowledged that he was fired because the store needed an individual that "could do about everything[,]" indicating that they needed someone who could stock and bag groceries. (R. at 298.) Miller testified that he has not attempted to work since being fired. (R. at 298.) Miller also testified that he occasionally mowed his parents' yard and his grandmother's yard. (R. at 299.) He stated that he usually mowed the yards about one time per week and that his grandmother paid him for his work. (R. at 299.)

Miller noted that his treating physician was Dr. Randall E. Pitone, M.D., a psychiatrist. (R. at 299.) He also testified that he had seen case manager Nancy

Case 2:07-cv-00056-GMW-PMS  Document 20  Filed 08/08/08  Page 5 of 48  PageID#: 71

Taylor, B.S., at Dr. Pitone's office and that she talked to him and helped him set goals. (R. at 300.) He indicated that he was successful at some of the goals, but had been unsuccessful in his attempts to go out of the house more often. (R. at 300-01.) Miller testified that he spent the majority of his time at his house, noting that he felt confined and nervous when he was around other people. (R. at 301.) He stated that he took medication to treat his problems. (R. at 301.) Miller testified that the medication helped calm him and also caused him to be less tense and worrisome. (R. at 301.) Miller explained that he often worried about helping his family. (R. at 301.) He testified that his hobbies included fishing. (R. at 301.) He noted that he normally fished alone, but that he had one friend with whom he occasionally fished. (R. at 301.) Miller testified that he did not have a problem counting, noting that he was "somewhat" good at it. (R. at 302-03.) Additionally, he indicated that he was able to take care of his own needs, such as dressing and shaving. (R. at 303.)

Miller testified that he experienced sleep difficulties at times due to worrying about his parents and "how they'll make it through." (R. at 303.) He commented that he worried about them "[d]ay in and day out." (R. at 303.) He also stated that he sometimes visited his brother and that they argued at times. (R. at 304.) Miller testified that he did not shop because he had trouble being around large crowds. (R. at 304-05.) Miller explained that being around people caused him to become claustrophobic, and make him feel like everything was closing in around him. (R. at 305.) He indicated that he believed he had experienced panic attacks, but he was not sure. (R. at 305.)

Miller's mother, Helen Miller, also testified at the hearing. (R. at 305.) Mrs.

-6-

Miller indicated that Miller had resided with his parents his entire life. (R. at 306.) She testified that Miller was enrolled in special education classes from first grade until the time he quit school. (R. at 306.) She further testified that he quit due to problems with reading, writing and mathematics. (R. at 306.) According to Mrs. Miller, her son got along "all right" with other children. (R. at 306.) She stated that Miller regularly attends monthly counseling, which she thought had helped him to some degree. (R. at 307.) Mrs. Miller noted that her and her husband transported their son to and from counseling because he was "not really able to get there." (R. at 307.) She explained that when he first sought treatment, it took her a while to get him in the building because he would not enter the waiting area. (R. at 307.) She explained that it was arranged so that he could exit the vehicle and go straight back to be treated without having to wait in the waiting room due to his inability to deal with people. (R. at 307-08.)

Mrs. Miller stated that her son did not speak on the way to the hearing. (R. at 308.) She commented that Miller "just mumbles" and that most of the time he does not talk much, even when at home. (R. at 308.) Mrs. Miller also explained that he quit school because "he was having such a hard time [with] all the special classes and he thought people were just making fun of him" for taking the special education classes. (R. at 308.) She testified that a good deal of his class work was completed on tape, so that he could do it orally. (R. at 308.) Mrs. Miller confirmed that it took her son three times to pass the oral driver's license exam. (R. at 309.) She explained that Miller did not associate with people or leave the house that much. (R. at 309.) Specifically, she stated that Miller only had one friend, indicating that the two fished together and that the friend would occasionally come by their house. (R. at 309.)

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 7 of 48   Pageid#: 73

Mrs. Miller attributed Miller's problems to his nervous condition and inability to deal with the public. (R. at 309.)

When asked about her son's past employment, Mrs. Miller stated that Miller was under the impression that the job at the pizza restaurant was simply a delivery job; however, once they informed him that he also would have to work inside as a cook, she stated "he just couldn't do it." (R. at 309.) In addition, she testified that he also could not perform the delivery job because he "could not read [road] signs good enough to know where he[ was] at unless he was familiar with the place." (R. at 309.) Furthermore, Mrs. Miller testified that he was unable to work at the grocery store because he could not read good enough to properly stock and he could not deal with the public when attempting to bag groceries. (R. at 310.) She explained that he was fired because he consistently called in sick, but, according to Mrs. Miller, his inability to perform the jobs was due to his nerves. (R. at 310.) She indicated that she had attempted to encourage him to work, but that she could not push him too much because of the fear that he would "break down bad." (R. at 310.)

Mrs. Miller testified that she had to call his grandmother to see when she wanted her yard mowed and to collect the money because he "won't ask anybody for anything." (R. at 311.) She opined that if something happened to her or her husband, Miller would not be able to survive because he "won't ask anybody for anything." (R. at 311.) She also noted that he even had difficulty going to get gasoline for the car. (R. at 311.) She testified that Miller would occasionally go to Wal-Mart with her, but that they "ha[d] to hurry and get [what they needed] and get back out." (R. at 311-12.) She stated that he could not handle being around other people. (R. at

-8-

312.)

Thomas Schacht, a medical expert, was present and also testified at the hearing. (R. at 312-22.) When asked whether any additional evidence was needed to assist in reaching a diagnosis, Schacht noted that there were some conflicts in the record, which he thought additional evidence might resolve, but he explained that such information did not exist. (R. at 313-14.) Based upon the information that he reviewed, Schacht found that Miller suffered from a learning disability that was documented by Miller's history of special education in Exhibits 1F, 2F and 3F. (R. at 314.) Schacht testified that there was a conflict within the record as to Miller's level of functioning, particularly as to Miller's literacy. (R. at 314.) Schacht further testified that, if one were to view the record in the light most favorable to Miller, "which would mean resolving the discrepancy about reading in favor of him having minimal literacy" and accepting his assertions "about being able to function in large groups or crowds or claustrophobic area[,]" then Miller would be limited to occupations that allow "him to work relatively independently and preferably jobs that would allow him to be outdoors." (R. at 319.)

Upon examination by Miller's counsel, Schacht opined that, based upon the last individualized education plan, there was no indication that Miller had difficulty following instructions because the education records showed that he was a good visual learner that listened carefully. (R. at 320.) Schacht explained that as long as the instructions were not given in written form, Miller apparently performed quite well. (R. at 320.) Schacht would not concede that Miller was functionally illiterate; instead, he reiterated his opinion that there was a discrepancy in the record as to Miller's literacy. (R. at 320.) He noted that portions of the record showed that Miller

-9-

passed the Virginia literacy test, while other portions indicated that he read at a second grade level. (R. at 320.) Schacht acknowledged that Miller had been diagnosed with dysthymic disorder, which he characterized as chronic, low-grade depression. (R. at 321.) However, he explained that the treatment records revealed that Miller's mood components responded well to treatment, noting that Miller admitted to improvements. (R. at 321.) Schacht testified that no other testing was needed in this particular case, stating that "this guy really needs . . . to get with the program that was recommended at the mental health center and participate in [the] psychotherapeutic portion of the treatment plan . . . ." (R. at 321.) Schacht noted that the treatment goal would likely be to change Miller's avoidance behavior. (R. at 321.)

Donna Bardsley, a vocational expert, also testified at the ALJ hearing. (R. at 322-27.) Bardsley reported that Miller had no past relevant work of which she was aware. (R. at 323.) Bardsley was asked to assume a hypothetical individual of the same age, education and work experience as Miller, who had no exertional limitations and who possessed the limitations noted by Schacht. (R. at 324.) Bardsley testified that such an individual would be able to perform work as a general laborer at every exertional level. (R. at 324.) Bardsley indicated that work as a general laborer exists in significant numbers in the regional and national economies. (R. at 324.) The ALJ posed a second hypothetical and asked Bardsley to consider an individual of the same age, education and work experience as Miller, who had no exertional limitations and was restricted by the non-exertional limitations set forth in Exhibit 8F. (R. at 324.) She opined that these limitations would not have an impact on the individual's ability to perform gainful employment. (R. at 325.) Bardsley also opined that, if the

-10-

testimony of Miller and his mother was credible and reliable, Miller would be incapable of performing any gainful employment. (R. at 325.)

Miller's counsel asked Bardsley if a job as a general laborer would allow Miller to work alone, with no one around. (R. at 326.) Bardsley stated that other people would be around in proximity to Miller, but he would be doing the job by himself. (R. at 326.) Miller's counsel asked whether a severe limitation as to goal setting and making plans would impact the ability to perform work as a general laborer. (R. at 326.) Bardsley testified that the jobs are unskilled, therefore, a supervisor would instruct Miller and he would not be required to make any independent decisions. (R. at 326.) She also reported that difficulties adapting to changes on the job would not impact Miller's ability to work as a general laborer. (R.at 326-27.) Bardsley acknowledged that Miller would be required to follow certain instructions to complete his goals. (R. at 327.) Bardsley stated that if Miller's Global Assessment of Functioning, ("GAF"), score was 45 to 50,[5] as reported by a treating source, resulting in a severe limitation in successfully completing job requirements, Miller would not be able to perform the identified jobs as a general laborer. (R. at 327.)

In rendering his decision, the ALJ reviewed medical records from Gene H. Collins, M.A.; Frontier Health; Wise County Department of Social Services; Donna Abbott, M.A.; B. Wayne Lanthorn, Ph.D.; Eugenie Hamilton, Ph.D, a state agency

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 11 of 48   Pageid#: 77

psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; and Wise County Behavioral Health Services. Miller's counsel submitted additional medical records from Dr. Randall E. Pitone, M.D., a psychiatrist, to the Appeals Council by letter dated February 21, 2007.[6]

On April 12, 1996, a psychological evaluation was performed by Gene H. Collins, M.A. (R. at 132-36.) Miller was referred for the evaluation in order to monitor and update his placement in special education for learning disabilities. (R. at 132.) In reviewing Miller's background, Collins noted that Miller's previous evaluations strongly suggested the need for special education. (R. at 132.) Standardized test scores indicated that Miller was in the bottom 15 percent of his age group and that he had yet to pass the math and writing sections of the test. (R. at 132.) Collins noted that Miller was described as an extremely weak student that was embarrassed and easily frustrated. (R. at 132.) In addition, school records showed that Miller had been diagnosed with attention deficit hyperactivity disorder, ("ADHD"), for which he had been prescribed Ritalin. (R. at 132.) During the evaluation, Miller was observed to be friendly, talkative and cooperative. (R. at 132.) Collins determined that Miller's language, mood and affect were all appropriate and no obvious sensory deficits were noted. (R. at 132.) Collins reported that Miller's motor behavior was task appropriate, but that he was easily distracted and prone to impulsive and careless work habits. (R. at 132.) Collins also reported that Miller's attitude and effort were good and that it was obvious that Miller was attempting to

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Secretary of Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-12-

make a good impression. (R. at 132.) Collins pointed out that Miller was evaluated while on his medication for ADHD. (R. at 133.)

Collins administered the Wechsler Intelligence Scale for Children-III, ("WISC-III), which yielded a pro-rated verbal quotient of 84+-5 and a full scale intelligence quotient, ("IQ"), of 85+-3. (R. at 133.) Collins noted that Miller functioned within the "'slow learner'" range of educational intelligence and explained that repeated testing would likely show him scoring within an IQ band of 75 to 90. (R. at 133.) The testing indicated that Miller seemed to learn much better visually than verbally. (R. at 133.) Collins found that Miller's auditory attention and concentration skills were adequately developed and consistent with his overall mental capacity. (R. at 133.) Collins determined that Miller's visual attention, concentration and task completion skills were weak and served to lower his overall test performance to some extent. (R. at 133.) Collins noted that, at times, Miller experienced some major lapses in internal concentration. (R. at 133.) Miller's test scores also showed unusual gaps and discrepancies in his cognitive profile. (R. at 133.) Miller displayed strengths in visual discrimination skills and in visual sequencing of socially relevant situations, and his expressive, reasoning and spatial skills were found to be adequate. (R. at 133.) Collins reported that Miller experienced difficulty in all tasks that required sustained attention, concentration and effort. (R. at 134.) Collins found that Miller had extreme difficulty with psychomotor accuracy and showed severe weakness in areas that measured long-term memory for factual concepts. (R. at 134.) Collins noted that Miller was not an incidental learner, noting that he appeared to learn in "bits and pieces." (R. at 134.) Collins reported that Miller's score on the WISC-III was indicative of a student with processing style imbalance and "lots of

-13-

scatter in his skills." (R. at 134.) Collins also noted that Miller exhibited signs of inherent attentional deficits that appeared to disrupt optimal functioning. (R. at 134.) In addition, Collins opined that the difference between Miller's performance and verbal learning styles was significant, noting that the difference was likely to increase even further as Miller aged. (R. at 134.)

Collins also administered the Wide Range Achievement Test, ("WRAT-3"), which indicated that Miller continued to significantly underachieve in the areas of reading and spelling, as he could only read and spell simple, high frequency words. (R. at 134.) Collins reported that Miller's best subject was mathematics, noting that his mathematic skills were low average and only slightly below his grade level at the time of the examination. (R. at 134.) Miller's scores on the Dreier Oral Reading Criterion Test indicated "much concern" with regards to Miller's reading skills. (R. at 134.) His scores placed him at a first grade independent reading level, a second grade instructional reading level and a third grade frustration level. (R. at 134.) Miller's Bender Visual-Motor Gestalt Test contained no errors and reflected a normal visual-motor coordinator for his age. (R. at 134.) Miller demonstrated an average or normal short-term visual memory according to the Bender Visual-Motor Gestalt Recall Test. (R. at 134.) The Kinetic Family Drawing and House Tree Person tests suggested that Miller felt very insecure and inadequate in school. (R. at 135.) Collins noted that Miller was apt to present with feelings of frustration, anxiety and little or no academic confidence. (R. at 135.) Collins explained that these findings were typical for a student with a learning disability. (R. at 135.)

Collins recommended continued eligibility for special education and noted that

-14-

Miller was appropriately placed in those classes due to his learning disabilities. (R. at 135.) Collins also recommended that Miller's specialized program emphasize basic reading comprehension, written composition and math skills. (R. at 135.) Collins acknowledged that Miller had passed the reading section of the standardized tests and that he appeared to have a good chance of eventually passing the mathematics portion. (R. at 135.) Collins determined that Miller's writing and spelling deficiencies were "so severe that he [would] likely need accommodations in [those] areas." (R. at 135.) Collins reported that Miller continued to exhibit the testing patterns and working habits typical of the adolescent ADHD population. (R. at 135-36.) Collins recommended that Miller's medication be continued because Miller reported that the Ritalin helped him concentrate and "settle down." (R. at 136.) Additionally, Collins suggested that, due to Miller's enjoyment of physical education, he should be encouraged to participate in sports. (R. at 136.) Collins indicated that this could provide structure and an outlet for his energy, as well as improvement in his confidence and self-esteem, which, according to Collins, Miller desperately needed. (R. at 136.)

The record also contains information from Norton City Schools, which is related to Miller's progress in the Special Education Individualized Education Program, (IEP). (R. at 137-56.) In an assessment dated March 25, 1999, Miller was described as a well behaved student that was generally hard working and who worked well in small groups. (R. at 155.) However, he occasionally had to be reminded to stay on task. (R. at 155.) The assessment also noted that Miller was able to work independently and that he was responsible. (R. at 155.) No additions or modifications to the IEP were suggested and it was recommended that Miller remain

in special education due to his disability. (R. at 155.) The records also showed that Miller was a visual learner that listened carefully, got along well with others and worked hard. (R. at 148.) It was noted that Miller needed "hands on type of work." (R. at 148.) Miller's interpersonal skills, work abilities, work behaviors and attendance were rated as satisfactory. (R. at 140, 148.) In addition, Miller was found to be in good health with adequate self-care skills. (R. at 140, 148.)

Miller was found to be significantly below grade level in all academic subjects. (R. at 149.) It was reported that he functioned in the slow learner range of ability. (R. at 149.) Despite being below grade level in each subject, Miller had shown improvement in all subject areas. (R. at 149.) It was noted that Miller needed assistance in spelling, in organizing his thoughts and that he needed his work read orally. (R. at 149.) In order for Miller to be mainstreamed into regular classes, the following modifications were suggested: oral examinations and quizzes; make arrangements for homework assignments to reach home with clear, concise directions; recognize and give credit for student's oral participation in class; student should be allowed to copy another student's class notes; utilization of peer tutoring and accompany oral directions with written directions. (R. at 144.) As of the year 2000, Miller possessed a third grade reading level and a seventh grade mathematics level. (R. at 140.) The records indicate that Miller was exempt from all Virginia State Assessment Program tests because he was at least two grade levels below in all subject areas. (R. at 139, 150.) On May 24, 2000, it was reported that Miller had improved in all academic areas. (R. at 137.) It was reiterated that Miller was a visual learner that required hands on experience. (R. at 137.) He was said to be a good worker who always attempted his classroom work and tried his best. (R. at 137.) As

-16-

of May 2000, Miller's expression in writing skills had greatly improved. (R. at 137.) However, it was again noted that Miller needed his work read orally and needed to be assisted in spelling. (R. at 137.)

Miller was treated at Frontier Health and Wise County Behavioral Health Services, ("WCBHS"), from April 7, 2004, to May 8, 2006, by Dr. Randall E. Pitone, M.D., and Nancy Taylor, B.S. (R. at 157-221.) Miller was referred to Frontier Health by his mother due to problems regarding nerves and anxiety. (R. at 218, 220.) During his initial visit on April 7, 2004, Miller was not found to be a danger to himself or others. (R. at 218.) The visit was not an emergency situation and it was noted that Miller was not suicidal. (R. at 218.) Miller complained of scared feelings around large crowds, which caused his heart to race and made him feel like could not breath. (R. at 220.) Miller denied any suicidal/homicidal ideations and reported no hallucinations. (R. at 220.) He explained that he did not leave the house by himself, but noted that he fished with a friend for relaxation. (R. at 220.) Miller complained of poor memory and concentration, as well as depression and loss of interest. (R. at 220.) Furthermore, Miller reported that while in school he experienced anxious feelings, which had progressively worsened. (R. at 220.) He also reported mood swings and anger issues. (R. at 220.) Taylor noted that Miller had the presence of supportive/positive family relationships, with no extra-familial social networks. (R. at 221.) She also reported that Miller had no history of stable occupational functioning. (R. at 221.) Miller presented no history of violent behavior or chronic drug or alcohol use/abuse. (R. at 221.) While Taylor reported an absence of suicidal behavior, she noted that there were psychiatric problems. (R. at 221.)

-17-

Miller's provisional diagnosis was panic disorder with agoraphobia, severe major depressive disorder and a GAF score of 40.[7] (R. at 221.) Taylor noted that Miller had limited social interaction and no income. (R. at 221.) A clinical assessment noted that Miller was depressed, withdrawn and agitated, and that he showed signs of paranoia and anxiety. (R. at 221.) Taylor opined that there had been a marked reduction in Miller's condition, noting that Miller reported that his anxiety had increased, causing him to experience panic attacks on a regular basis. (R. at 221.) Taylor found that Miller did not meet the criteria for hospitalization and/or commitment, but she did recommend case management and possible short-term counseling. (R. at 221.)

On May 4, 2004, Taylor determined that Miller met the criteria for inclusion in the Adult Mental Health Priority Population. (R. at 213-15.) The Adult Mental Health Priority Population Classification Form noted diagnoses of major depressive disorder and panic disorder with agoraphobia. (R. at 213.) Taylor also reported that Miller was "unable to hold a job, or [] only able to work part-time for reasons that [were] specifically related to mental illness . . . OR require[d] a special learning environment in order to remain in school." (R. at 214.) Additionally, Taylor found that Miller suffered from social isolation, as he was "not in a supportive, confiding relationship with anyone in his[] life . . . and ha[d] face-to-face interactions with friends or family no more than once per month, on average." (R. at 214.) (emphasis in original). Taylor further determined that Miller's mental disorder was diagnosable

---

[7]A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work, school, family relations, judgment, thinking, or mood." DSM-IV at 32.

-18-

under DSM-IV and that it could lead to a chronic disability, noting that the disability resulted in functional limitations in major life activities. (R. at 215.) Thus, Taylor found that, due to Miller's condition, he required case management services. (R. at 215.) A treatment plan was established to increase Miller's leisure/recreation activities to help decrease anxiety and depression and to increase socialization and develop coping skills to deal with social phobia. (R. at 210-12.) This plan was approved by Taylor and Dr. Pitone. (R. at 212.)

On May 5, 2004, Taylor completed an Assessment of Needs and Services, which indicated poor employment history due to mental illness regarding social isolation and fear of people. (R. at 207.) Taylor also noted that Miller did not have adequate finances, noting that he received money from his parents, with no other financial assistance. (R. at 207.) Taylor again referenced Miller's fear of large crowds, as well as his social anxiety and isolation. (R. at 207.) Taylor reported that Miller had no social support system. (R. at 207.) Miller did not complain of problems related to his activities of daily living and he demonstrated an appropriate behavior. (R. at 208.) Miller alleged severe social anxiety, isolation and depression, and Taylor noted that Miller was not on any medication to treat the problems at the time of the evaluation. (R. at 208.) Other than Miller's complaints of mental illness, no other health problems were identified. (R. at 208.) Miller denied any substance abuse issues and reported no problems regarding nutrition or housing. (R. at 209.) Taylor noted that Miller would be monitored each month, or as needed. (R. at 207-09.)

An outpatient admission intake form was completed in May 2004, in which

-19-

Miller presented with social/interpersonal problems and depression or mood disorder. (R. at 191-204.) Taylor noted that Miller's mother referred him for treatment because she was worried about his behavior. (R. at 191.) Miller reported severe anxiety and fear of being around people. (R. at 191.) He also reported depression due to his anxiety and stated that he had experienced those type of feelings since he was in school. (R. at 191-92.) Miller denied any suicidal/homicidal ideations and no hallucinations were reported. (R. at 192.) Miller explained that typically he did not do anything throughout the day, other than watch television. (R. at 192.) He indicated that he wanted to get well so that he could be around people, stating that he was willing to seek treatment and see a psychiatrist. (R. at 192.) Miller explained that he took Ritalin as a child and continued the medication until he entered high school. (R. at 192.) He reported social isolation and restless sleep patterns and stated that he experienced poor attention and concentration as a child. (R. at 192.) At the time of this assessment, Miller had no prior mental health treatment or hospitalizations. (R. at 192.) A symptom checklist indicated severe symptoms as to academic or work inhibition, social withdrawal, anxiety, jitteriness, avoidance behavior, feelings of worthlessness, helplessness and hopelessness, loss of interest or pleasure and low self-esteem, and moderate symptoms relating to fear of separation, anger, a blunted or flat affect and a depressed mood. (R. at 195, 197.) The symptom checklist also noted mild symptoms as to hostility and irritability. (R. at 197.) A DSM-IV Assessment noted questionable panic disorder with agoraphobia, questionable severe major depressive disorder and a current GAF of 45. (R. at 199.) Miller's weaknesses included below average intelligence, lack of insight, dependent behaviors, guarded/distrusting feelings, limited financial resources, inadequate leisure and recreation, no social skills and social isolation. (R. at 199-200.) Taylor listed

-20-

Miller's optimism regarding treatment as a strength. (R. at 200.) Taylor again noted her recommendation for case management and monthly treatment. (R. at 201.)

Dr. Pitone saw Miller on June 9, 2004, for an initial psychiatric evaluation. (R. at 186-87.) Miller complained of anxiety when around other people and explained that the anxiety caused him to stay at home. (R. at 186.) He reported very little activity, noting that he spent the majority of his time watching television. (R. at 186.) Miller also claimed that he often felt depressed, with significant loss of interest, motivation and energy. (R. at 186.) He stated that he experienced difficulty getting to sleep and staying asleep during the night. (R. at 186.) Miller noted that his appetite was okay and he denied any suicidal or homicidal thoughts. (R. at 186.) Dr. Pitone noted that Miller was alert, oriented, calm and cooperative. (R. at 187.) Dr. Pitone reported that although Miller appeared to be shy and soft-spoken, he nonetheless answered questions, made eye contact, established rapport, provided information and conversed appropriately. (R. at 187.) Miller's psychomotor activity level was normal, but his mood was moderately depressed and he was moderately to severely anxious. (R. at 187.) Dr. Pitone found Miller's affect to be appropriate with good range, his perception was clear, his thought associations were intact and his thinking was organized and goal directed with normal rate and flow. (R. at 187.) Miller did not express any odd, bizarre or delusional thought content, and Dr. Pitone observed no feelings of hopelessness or helplessness. (R. at 187.) Miller's intelligence was estimated to be within the normal range, and his memory and other cognitive functions appeared to be intact. (R. at 187.) Miller recognized the nature and severity of his symptoms and acknowledged the potential benefits of treatment. (R. at 187.) Dr. Pitone diagnosed Miller with social anxiety disorder, depressive

-21-

disorder not otherwise specified and with a history of attention deficit disorder. (R. at 187.) Moreover, Dr. Pitone noted significant impairment of function and a limited support system. (R. at 187.) Miller's GAF score was assessed at 45 to 50. (R. at 187.) Dr. Pitone prescribed Lexapro to treat Miller's depression and anxiety disorder and advised Miller to return in approximately two months. (R. at 187.)

Miller presented to WCBHS on July 7, 2004, and reported that he was doing better. (R. at 185.) Miller indicated that the Lexapro had improved his mood, but explained that he still had difficulty in public around large crowds. (R. at 185.) His activities of daily living and other complaints were the same as reported during his previous visits. (R. at 185.) Miller appeared to be mildly depressed with a blunted affect and was moderately anxious. (R. at 185.) Taylor noted that Miller was cooperative and his thoughts seemed logical. (R. at 185.) His treatment regimen and diagnoses were unchanged and he was instructed to follow up with Dr. Pitone in three to four weeks. (R. at 185.) On August 5, 2004, Miller again reported some improvement due to Lexapro. (R. at 181.) However, he noted no significant increase in his leisure/recreation activities or in his social activities. (R. at 183.) Miller's complaints, symptoms and diagnoses were unchanged. (R. at 181.) Dr. Pitone increased Miller's Lexapro dosage and instructed him to return in two to three months. (R. at 181-82.)

Miller failed to present for scheduled appointments with Taylor on September 2, 2004, and September 16, 2004. (R. at 178-79.) Miller did manage to present on September 30, 2004, and reported that he was doing fair, but indicated that he remained unable to get out in social situations on his own. (R. at 177.) Miller

-22-

reported many of the symptoms that he reported in previous visits and commented that he felt like he would never get better. (R. at 177.) Miller reported that he was taking Lexapro 10 milligrams, ("mg"), instead of the 15 mg suggested by Dr. Pitone. (R. at 177.) Miller's dosage was increased to 20 mg one time per day. (R. at 177.) Taylor reviewed the dosage information with Miller and he verbally communicated his understanding. (R. at 177.) On October 27, 2004, Miller again failed to present for his scheduled appointment. (R. at 176.) On November 5, 2004, Miller reported no increase in leisure/recreation activities or in socialization activities. (R. at 175.) Miller indicated that his symptoms and stressors had increased. (R. at 175.)

Miller presented to Dr. Pitone on December 17, 2004, and reported that the Lexapro 20 mg dosage had been helpful in reducing his depression. (R. at 172.) At the time of the visit, Miller indicated that he did not feel depressed. (R. at 172.) Despite this improvement, Dr. Pitone noted that Miller continued to experience severe social anxiety with agoraphobia. (R. at 172.) Miller was advised to continue the Lexapro 20 mg daily and was prescribed Klonopin to treat his ongoing anxiety. (R. at 172.) Dr. Pitone further instructed Miller to continue working with Taylor, his case manager, and suggested that he return for treatment in two months. (R. at 172.) Taylor's notes from this visit indicated that Miller presented with a dysthymic mood with a flat affect. (R. at 171.)

On January 17, 2005, Miller informed Taylor that he was "doing better." (R. at 170.) Miller commented that his anxiety had decreased and his mood had improved. (R. at 170.) His daily activities remained the same, thus, Taylor encouraged Miller to go into public in order to gradually become more comfortable

-23-

in social situations. (R. at 170.) Taylor noted that Miller's mood appeared to be euthymic with a flat affect. (R. at 170.) Miller's treatment regimen was unchanged and he was advised to follow up in two to four weeks. (R. at 170.) On this date, Taylor completed a form reiterating Miller's previous diagnoses and opining that Miller could not perform either part-time or full-time work. (R. at 222.) Taylor explained that, as of January 2005, it was unknown as to when Miller would be able to return to work due to his mental illness. (R. at 222.) On February 18, 2005, Miller reported some increase in leisure/recreations activities and socialization, but also reported an increase in his symptoms and stressors. (R. at 168.) Taylor noted that Miller had not been compliant with his case management and therapy appointments. (R. at 168.) The case management services were re-authorized for a 90-day period to monitor Miller's status, provide support and to educate Miller regarding his medication, symptoms and coping skills. (R. at 168.) On March 11, 2005, Miller again failed to appear for his scheduled appointment. (R. at 167.)

On March 28, 2005, Miller presented to B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., who collectively performed a consultative psychological examination. (R. at 223–29.) During the examination, Miller stated that he applied for disability due to his nerves and because he could not read or spell well enough to maintain basic jobs. (R. at 224.) Miller indicated that he could not read a newspaper, but that he could read road signs and that he was able to take short phone notes. (R. at 224.) Miller was appropriately oriented; however, he was unable to identify the name or city of the place of his appointment and could not recall a recent news event. (R. at 224-25.) Miller was cooperative, but offered little information spontaneously. (R. at 225.) His effort was reported as adequate and

-24-

his memory processes appeared to be intact. (R. at 225.) Miller's abstract ability appeared to be fair and his use of common sense appeared to be marginal. (R. at 225.) In addition, he was able to attend, concentrate and follow directions and questions did not have to be repeated. (R. at 225.) Miller demonstrated adequate eye contact and spoke in a quiet tone of voice. (R. at 225.) Miller appeared to be mildly depressed. (R. at 225.) There was no evidence of tremors or psychomotor retardation. (R. at 225.) He denied hallucinations and there were no overt signs of disordered thought processes or delusional thinking, as Miller was rational and alert. (R. at 225.)

Miller stated that his nerves prohibited him from talking to people and prevented him from staying in public for extended periods. (R. at 225.) He indicated that the medication he had been prescribed had started to help his condition. (R. at 225.) Miller also reported tense feelings and he stated that he had been nervous around others for as long as he could remember. (R. at 225.) He mother reiterated these problems, noting that Miller would not go into crowds and that he did not like being around others. (R. at 225.) Lanthorn and Abbott noted that these symptoms suggested a lack of self-confidence and a possible social phobia. (R. at 225.) Miller related appropriately during the examination and also seemed capable of managing his own resources. (R. at 226.) Miller obtained a verbal IQ score of 77 on the WAIS-III, a performance IQ score of 80 and a full scale IQ score of 77, which placed him in the borderline range of current intellectual functioning. (R. at 226.) Miller's alertness to detail fell in the average range and appeared to be a strength. (R. at 227.) His weakest area was in the usage of common sense. (R. at 227.) Miller's overall psychomotor speed was in the borderline range and he was in the low average range

-25-

in word knowledge, abstract and concrete reasoning abilities, non-verbal concept formation ability, math computational skills, visual processing ability, ability to attend in a verbal situation, general fund of knowledge about his environment and planning ability. (R. at 227.) Miller obtained a Verbal Comprehension Index score of 82 and a Perceptual Organization Index score of 86. (R. at 227.) Miller exhibited good effort and his suspected full scale IQ score was estimated at between 74 and 81. (R. at 227.)

Miller was diagnosed with generalized social phobia, early onset of dysthymic disorder, borderline intellectual functioning and limited academic and intellectual skills. (R. at 227.) Miller's GAF score was assessed at 55 to 60.[8] (R. at 227.) Lanthorn and Abbott noted that Miller could understand and remember on a level commensurate with his intellectual functioning, but explained that he was likely to experience difficulty with detailed or complex instructions. (R. at 227.) In addition, they determined that Miller could attend and concentrate and that he should be able to maintain simple routine. (R. at 227.) However, based upon the evaluation, it was determined that Miller may have some difficulty working in close proximity to others due to his problems with crowds and interacting with people. (R. at 227.) An evaluation of his social interaction skills showed mild limitations as to being around large crowds of people. (R. at 227.) Miller exhibited a quiet manner and appeared to be lacking in self-confidence. (R. at 227.) Miller's general adaptation skills indicated moderate limitations. (R. at 227.) Lanthorn and Abbott opined that Miller would likely have difficulty driving in unfamiliar places by himself and that he may

---

[8]A GAF score of 51-60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32.

have difficulty setting goals and planning to obtain goals. (R. at 228.) They also determined that Miller was capable of taking precautions and being cognizant of normal hazards. (R. at 228.) In addition, they found that Miller would have some difficulty adapting to change and dealing with stress, primarily due to his poor self-concept and limited intellectual ability. (R. at 228.)

Lanthorn and Abbott noted that Miller's affect was mildly depressed and that his poor self-concept and lack of occupational and academic skills could lead to depression. (R. at 228.) Nonetheless, it was noted that Miller was alert and oriented, cooperative and that he put forth a fairly good effort during the evaluation. (R. at 228.) Lastly, Lanthorn and Abbott concluded that Miller might benefit from short-term counseling that would assist him in setting goals, making plans and improving his self-concept. (R. at 228.)

On April 18, 2005, Eugenie Hamilton, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 230-43.) In particular, Hamilton found that Miller's borderline intellectual functioning did not precisely satisfy the diagnostic criteria for an organic mental disorder. (R. at 231.) Hamilton also determined that Miller's dysthymic disorder and major depressive disorder were medically determinable impairments that did not precisely satisfy the diagnostic criteria for an affective disorder. (R. at 233.) Similarly, Hamilton found that Miller's panic disorder with agoraphobia and social phobia were medically determinable impairments that did not precisely satisfy the diagnostic criteria for an anxiety-related disorder. (R. at 235.) Hamilton found that Miller was moderately limited in maintaining social functioning and in maintaining concentration,

-27-

persistence or pace, with only a mild limitation as to activities of daily living. (R. at 240.) Hamilton noted no episodes of decompensation. (R. at 240.) Hamilton concluded that Miller's activities of daily living were not significantly limited and noted that his allegations were only partially credible. (R. at 243.) On August 29, 2005, E. Hugh Tenison, another state agency psychologist, reviewed and affirmed Hamilton's findings. (R. at 230.)

Hamilton also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on April 18, 2005. (R. at 244-47.) Hamilton found that Miller was not significantly limited in the ability to remember locations and work-like procedures, the ability to understand, remember and carry out very short and simple instructions, the ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, the ability to make simple work-related decisions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to ask simple questions or request assistance, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation or the ability to set realistic goals or make plans independently of others. (R. at 244-45.) Hamilton determined

that Miller was moderately limited in his ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 244-45.) Further, Hamilton noted that, although Miller was likely to have difficulty with detailed or complex tasks and working with the public, he nonetheless appeared to be capable of performing simple, unskilled competitive work. (R. at 246.) On August 29, 2005, Hamilton's assessment was reviewed and affirmed by Tenison. (R. at 246.)

On May 10, 2005, Miller failed to appear for his scheduled appointment at WCBHS. (R. at 166.) On May 16, 2005, Taylor completed another DSM-IV Assessment, which noted the same diagnoses and virtually the same findings as the previous assessment. (R. at 161-62.) However, during this assessment, Miller's current GAF score was 50 and Miller was found to be open instead of guarded or distrusting. (R. at 161-62.) Also, Taylor noted that Miller was aloof/reserved, which she found to be an additional weakness. (R. at 162.) Taylor and Dr. Pitone approved a new treatment plan for Miller, stressing that Miller keep all scheduled appointments. (R. at 163-64.) In addition, the treatment plan set forth certain objectives, such as to increase Miller's socialization by going out at least once a week in public. (R. at 163.) On May 26, 2005, Miller failed to present for a scheduled appointment. (R. at 160.) Taylor noted that Miller had been non-compliant with appointments for over 90 days and explained that his chart would be closed in 30 days if he failed to respond. (R. at 160.)

-29-

Miller presented to WCBHS on June 14, 2005, and reported no change in his condition. (R. at 159.) Miller acknowledged that the medication had helped him cope with depression, anxiety and social isolation, but he indicated that he had not taken either Lexapro or Klonopin in approximately two months due to financial difficulties and non-compliance with his scheduled appointments. (R. at 159.) Miller reported poor sleep patterns and a good appetite. (R. at 159.) His mood appeared to be euthymic with a flat affect and he was moderately anxious. (R. at 159.) Miller was prescribed Lexapro and Klonopin. (R. at 159.) Taylor advised Miller to return for treatment in three to four weeks, or as needed. (R. at 159.) Miller failed to show for scheduled appointments on June 28, 2005, and July 19, 2005. (R. at 157-58.)

On September 12, 2005, Miller presented to WCBHS. (R. at 269.) Carla McCurdy, B.S., a case manager, in her notes for Dr. Pitone, noted that Miller reported moody feelings and depression. (R. at 269.) Miller indicated that he had broken up with his girlfriend and also stated that he had experienced sleep difficulties. (R. at 269.) Miller informed Dr. Pitone that he had done well on his medication, but his recently ended relationship had caused increased depression and anxiety. (R. at 267.) He explained that he had been without his Lexapro for about two to three months, which could have caused his increased depressive symptoms. (R. at 267.) Dr. Pitone observed Miller's mood to be mildly depressed with a mildly anxious affect. (R. at 267.) Miller's symptoms, complaints and mental status remained otherwise unchanged. (R. at 267.) Dr. Pitone prescribed Lexapro, advised Miller to continue working with his case manager and instructed him to return in two months, or sooner if needed. (R. 267-68.) Miller did not show for his scheduled appointment on November 7, 2005. (R. at 265-66.)

-30-

Miller presented for a routine visit at WCBHS on November 30, 2005. (R. at 264.) Miller reported that he was "doing alright." (R. at 264.) He explained that he had been out of his medication for a few weeks, noting that it had recently been difficult for him to get out of bed in the mornings. (R. at 264.) Miller informed McCurdy that he had been sleeping better, but noted that he woke up often throughout the night. (R. at 264.) He indicated that he occasionally went out with friends, but that he mainly stayed at home. (R. at 264.) Miller further explained that he continued to experience bad anxiety when in crowds. (R. at 264.) Miller stated that his non-compliance with scheduled appointments was due to lack of financial resources. (R. at 264.) McCurdy noted that Miller's mood appeared to be nervous and his thought content seemed to be congruent with his mood. (R. at 264.) McCurdy opined that Miller seemed to be maintaining at the time of the visit. (R. at 264.) Miller was prescribed Lexapro 20 mg. (R. at 264.) Miller failed to present for his scheduled appointment on December 6, 2005. (R. at 262.)

Miller sought treatment at WCBHS on December 29, 2005, and reported that he was doing well at the time of the visit. (R. at 261.) Miller informed McCurdy that he did not feel as depressed, noting that he had been compliant with his Lexapro prescription. (R. at 261.) Miller once again explained that he avoided public settings due to his anxiety. (R. at 261.) McCurdy noted that Miller's mood appeared to be slightly nervous and that his thought content was congruent with his mood. (R. at 261.) McCurdy opined that Miller continued to maintain and she advised him to return for a scheduled appointment in one month. (R. at 261.) On January 30, 2006, Miller reported that he was doing "fairly well" on his current medication. (R. at 258.) He reported continued complaints of anxiety in social situations. (R. at 258.) He

-31-

explained that he spent the majority of his time in his room, away from his family and other people. (R. at 258.) Miller reported no problems as to his eating or sleeping habits. (R. at 258.) He acknowledged that Lexapro helped his anxiety and depression somewhat, noting that he was pleased with the medication. (R. at 258.) Miller's compliance with scheduled appointments was discussed and he was encouraged to attend all appointments so that the clinic could continue providing services. (R. at 258.) Miller's mood was euthymic and his affect was pleasant. (R. at 258.) He presented no overt signs of psychosis and no change was noted in his cognitive function. (R. at 258.) Miller was prescribed Valium and continued on Lexapro. (R. at 258.)

Miller presented to WCBHS on February 28, 2006, where he saw Amanda Ellis, B.S. (R. at 256.) Miller explained that he had been "doing pretty good." (R. at 256.) He continued to report feelings of social anxiety and depression, but indicated that the medication had helped him. (R. at 256.) Miller noted that he looked forward to the summer, so that he could fish with friends. (R. at 256.) Miller's mood appeared to be depressed, with a congruent affect. (R. at 256.) He appeared to be stable at the time of this visit. (R. at 256.) Miller again saw Ellis on April 28, 2006, and reported that he was "doing pretty good." (R. at 255.) He again noted that he had problems leaving his house, especially when going to a large store. (R. at 255.) Miller stated that he was not eating or sleeping good, and he explained that he had felt depressed due to the fact that he could not get out, noting that his symptoms had worsened. (R. at 255.) He indicated that he occasionally fished with friends and that fishing helped his symptoms of depression. (R. at 255.) Ellis observed Miller to be anxious with a congruent affect. (R. at 255.) She noted that

-32-

he appeared to be stable at the time of the examination. (R. at 255.) A DSM-IV Assessment dated May 8, 2006, noted diagnoses of panic disorder with agoraphobia and a severe major depressive disorder, with a current GAF score of 50. (R. at 253.)

On February 8, 2007, Dr. Pitone completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 287-88.) Dr. Pitone determined that Miller had a fair ability to follow work rules and deal with work stresses, a good ability to use judgment with the public and to maintain attention and concentration and poor or no ability to relate to co-workers, deal with the public, interact with supervisors or function independently. (R. at 287.) Dr. Pitone noted that this assessment was supported by Miller's various stressors, the fact that Miller consistently isolated himself at home and because of his increased anxiety and stress in public settings. (R. at 287.) Dr. Pitone made no findings as to Miller's ability to make performance adjustments, manage his own benefits or how his impairments impact other work-related activities. (R. at 288.) However, he did note that Miller had a good ability with regards to his ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 288.)

### III. Analysis

The Commissioner uses a five-step process in evaluating CDIB and SSI claims. 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working;

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 33 of 48   Pageid#: 99

2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 7, 2006, the ALJ denied Miller's claims. (R. at 18-23.) The ALJ found that Miller met the nondisability insured status requirements of the Act for CDIB purposes, as set forth in § 202(d) of the Act. (R. at 22.) The ALJ also found that Miller had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ determined that the medical evidence established that Miller's combination of borderline intellectual functioning, minimal literacy and social phobia amounted to a severe impairment. (R. at 22.) In addition, the ALJ determined that Miller's allegations regarding his limitations were not totally

credible. (R. at 22.) The ALJ found that Miller retained the residual functional capacity to perform work at all exertional levels, subject to the limitations outlined in Exhibit 8F[9] and the limitations noted by Thomas Schacht, a medical expert who testified at the ALJ hearing. (R. at 22.) Specifically, the ALJ determined that Miller retained the residual functional capacity to perform a significant range of heavy work. (R. at 23.) The ALJ also found that Miller had no past relevant work experience. (R. at 22.) The ALJ noted that, although Miller's exertional limitations did not allow him to perform the full range of heavy work, according to Medical-Vocational Rule 204.00, Miller was capable of performing a significant number of jobs within the national economy, including work as a general laborer at any exertional level. (R. at 23.) Therefore, the ALJ concluded that Miller was not disabled under the Act at any time through the date of the decision, and, thus, not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.350(a)(5), 404.1520(c), 416.924(c) (2008).

Miller argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 5-13.) Miller contends that the ALJ erred in evaluating the severity of his mental impairments and the resulting impact on his ability to work. (Plaintiff's Brief at 5-6.) In particular, Miller argues that the ALJ failed to accord proper weight to the opinions of Miller's treating psychiatrist, Dr. Pitone, who noted a GAF score of 45 to 50, and the opinion of his case manager, Nancy Taylor, who opined that Miller could not work part-time or full-time. (Plaintiff's Brief at 10-11.) Miller also argues that,

---

[9]Exhibits 8F refers to a Mental Residual Functional Capacity Assessment, ("MRFC"), which was completed by Eugenie Hamilton, Ph.D., a state agency psychologist, on April 18, 2005. (R. at 244-47.)

-35-

pursuant to 42 U.S.C. § 405(g) sentence six, a remand is warranted to consider the evidence that was submitted to the Appeals Council, evidence which Miller claims could have altered the ALJ's decision. (Plaintiff's Brief at 12.) Lastly, Miller argues that the ALJ failed to pose a proper hypothetical to the vocational expert, as the ALJ's hypothetical failed to include each limitation as set forth in his residual functional capacity finding. (Plaintiff's Brief at 12-13.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical

-36-

opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Miller first argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate Miller's mental impairments and the manner in which the impairments would impact his ability to perform work. (Plaintiff's Brief at 5-6.) This argument is without merit. The ALJ determined that Miller retained the residual functional capacity to perform a significant range of heavy work. (R. at 23.) Specifically, the ALJ found that Miller was capable of performing work at all exertional levels that required no more than minimal literacy. (R. at 20.) The ALJ also determined that Miller would be further limited by the findings noted by Schacht, who opined that, in viewing the evidence in the light most favorable to Miller, and accepting his assertions as true, Miller would be limited to jobs that allowed him to work independently and preferably outdoors. (R. at 319.) The ALJ also imposed the limitations set forth in Exhibit 8F, in which Hamilton and Tenison determined that Miller was moderately limited in his ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 244-45.) Hamilton and Tenison found that Miller was capable of performing simple, unskilled competitive work. (R. at 246.)

In arriving at his decision, the ALJ discussed the relevant and probative medical evidence related to Miller's alleged mental impairments. (R. at 17, 20-21.)

-37-

The ALJ briefly summarized the relevant treatment notes and diagnoses made by Frontier Health and WCBHS, as well as the findings and diagnoses offered by Lanthorn. (R. at 17.) He also discussed the opinions of Schacht and the state agency psychologists, which specifically addressed Miller's mental impairments and the impact they would have on his ability to work. (R. at 17, 20.) As mentioned above, when ascertaining whether substantial evidence supports the ALJ's decision, it is this court's duty to consider whether the ALJ analyzed all the relevant evidence and whether he sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. After reviewing the ALJ's decision, the court is of the opinion that the ALJ adequately explained his findings and his rationale in crediting the evidence, as he summarized the relevant evidence and set forth the evidence upon which he relied.

Next, Miller contends that the ALJ failed to accord proper weight to the opinions of Miller's treating psychiatrist, Dr. Pitone, who assessed Miller's GAF score at 45 to 50, and the opinion of Miller's case manager, Nancy Taylor, who opined that Miller could not work part-time or full-time. (Plaintiff's Brief at 10-11.) I disagree.

In general, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitutes a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008).

-38-

However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[10] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Miller's treating psychiatrist, Dr. Pitone, consistently treated Miller for mental health problems, between April 7, 2004, and May 8, 2006. (R. at 157-221, 253-69.) As a part of this treatment, Miller regularly saw case managers at WCBHS, particularly Nancy Taylor. During these visits, Miller repeatedly complained of anxiety, depression, isolation and fear of being in public around crowds. On April 7, 2004, Taylor noted provisional diagnoses of panic disorder with agoraphobia, severe depressive disorder and a GAF score of 40. (R. at 221.) Furthermore, on May 4, 2004, Taylor's findings suggested that Miller was unable to hold a job, or only work part-time due to problems associated with his mental illness. (R. at 214.) In June 2004, Dr. Pitone diagnosed Miller with social anxiety disorder, depressive disorder not otherwise specified and a history of attention deficit disorder. (R. at 187.) Dr. Pitone noted a significant impairment of function, a limited support system and a GAF score of 45 to 50. (R. at 187.) During this course of treatment, Dr. Pitone

---

[10]*Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

prescribed Lexapro, Klonopin and Valium to treat Miller's depression and anxiety disorder. (R. at 157-221, 248-69.) On January 17, 2005, despite the fact that Miller reported that he was "doing better[,]" and that his anxiety had decreased and his mood had improved, Taylor completed a form that indicated that Miller could not perform either part-time or full-time work. (R. at 170, 222.) Taylor further noted that, as of January 2005, it was unknown as to when Miller would be able to return to work due to his mental illness. (R. at 222.) On February 8, 2007, Dr. Pitone completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), in which in found that Miller had a fair ability to follow work rules and deal with work stresses and poor or no ability to relate to co-workers, deal with the public, interact with supervisors or function independently. (R. at 287.) Dr. Pitone opined that these limitations were supported by Miller's various stressors, the fact that he consistently isolated himself and because of his increased anxiety and stress in public settings. (R. at 287.)

However, despite these restrictive findings, the treatment notes from Frontier Health and WCBHS indicate that Miller acknowledged improvement when in compliance with his medication. (R. at 159, 170, 172, 181, 185, 255-56, 258, 261, 264, 267.) On various occasions, Miller indicated that he was doing well and that his medication helped his condition. (R. at 159, 170, 172, 181, 185, 255-56, 258, 261, 264, 267.) In addition, the record clearly shows that Miller failed to take full advantage of the treatment opportunities presented to him. He routinely missed scheduled appointments, which, in turn, caused him to go without his medication and resulted in several warnings regarding compliance with treatment. (R. at 157-58, 160, 166-67, 178-79, 262, 265-66.) It also should be noted that Dr. Pitone found that

-40-

Miller had a good ability to use judgment with the public and to maintain attention and concentration. (R. at 287.) He further found that Miller had a good ability with regards to maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations and in demonstrating reliability. (R. at 288.) Notably, Dr. Pitone made no specific findings as to Miller's ability to make performance adjustments, manage his own benefits or how his impairments would impact other work-related activities. (R. at 288.) The court also points out that Dr. Pitone's treatment notes, as well as those of the case managers, consisted primarily of subjective complaints.

The remaining relevant evidence of record is devoid of any significant findings of further mental limitations regarding Miller's ability to work that were not accounted for in the ALJ's residual functional capacity finding. A consultative psychological examination by Lanthorn and Abbott indicated that Miller displayed an adequate effort and his memory processes appeared to be intact. (R. at 225.) His abstract ability was found to be fair and he was able to attend, concentrate and follow directions. (R. at 225.) Mild depression was noted, but Miller exhibited no evidence of tremors, psychomotor retardation, hallucinations, disordered thought process or delusional thinking; instead, he was rational and alert. (R. at 225.) During this examination, Miller reported similar symptoms regarding his nerves and anxiety, however, he acknowledged that his prescribed medication had helped his condition. (R. at 225.) Lanthorn and Abbott opined that these symptoms indicated a lack of self-confidence and a possible social phobia. (R. at 225.) Miller was diagnosed with generalized social phobia, the early onset of dysthymic disorder, borderline intellectual functioning and limited academic and intellectual skills. (R. at 227.)

Additionally, Miller's GAF score was assessed at 55 to 60, notably higher than Dr. Pitone's assessment. (R. at 227.) Lanthorn and Abbott noted that Miller was likely to experience difficulty with detailed or complex instructions, but they found that he should be able to maintain simple routines. (R. at 227.) It also was determined that Miller would likely have some difficulty working in close proximity to others due to his problems with crowds and interacting with people. (R. at 227.) His general adaptation skills were found to be moderately limited and it was noted that he would probably have difficulty driving in unfamiliar areas. (R. at 228.) Lanthorn found that Miller also would have difficulty setting goals, planning to obtain goals, adapting to change and dealing with stress. (R. at 228.) In conclusion, Lanthorn and Abbott found that Miller might benefit from short-term counseling that would help him set goals, make plans and improve his self-concept. (R. at 228.)

As summarized earlier, the testimony of Schacht indicated that, in viewing the evidence in the light most favorable to Miller, and accepting his allegations as true, Miller would be limited to jobs that allowed him to work independently, preferably outdoors. (R. at 319.) A MRFC completed by state agency psychologists Hamilton and Tenison, noted only moderate limitations, finding that Miller was capable of performing simple, unskilled competitive work. (R. at 246.) Hamilton and Tenison also completed a PRTF, which indicated that Miller's borderline intellectual function, dysthymic disorder, major depressive disorder, panic disorder with agoraphobia and social phobia did not precisely satisfy the diagnostic criteria required for organic mental disorders, affective disorders and anxiety-related disorders. (R. at 230-31, 233, 235.) The state agency psychologists noted only moderate limitations in the areas of maintaining social functioning and concentration, persistence or pace, with

-42-

only a mild limitation as to activities of daily living. (R. at 240.) Hamilton and Tenison noted no episodes of decompensation. (R. at 240.) Lastly, Hamilton and Tenison concluded that Miller's activities of daily living were not significantly limited and that his allegations were only partially credible. (R. at 243.)

After reviewing the relevant medical evidence, the undersigned is of the opinion that the ALJ's decision to accord less weight to the opinion's of Dr. Pitone and Nancy Taylor is supported by substantial evidence. In this case, despite the limitations noted by the treating sources, specifically the opinion noted by Taylor that Miller was incapable of performing either part-time or full-time work, I find that these opinions were inconsistent with other substantial evidence. Therefore, because the opinions of the treating physicians were inconsistent with other substantial evidence of record, the ALJ did not err by according the opinions significantly less weight.[11] *See Craig*, 76 F.3d at 590.

Miller also argues that, according to sentence six of 42 U.S.C. § 405(g), a remand is warranted because new evidence was submitted to the Appeals Council that was material to the determination of disability. (Plaintiff's Brief at 12.) I disagree. In this case, following the ALJ's hearing, Miller's counsel submitted additional evidence to the Appeals Council, namely a Medical Assessment Of Ability To Do Work-Related Activities (Mental) completed by Dr. Pitone. The Appeals Council

---

[11]Miller also asserts that Dr. Pitone's opinion should be accorded greater weight because he is a specialist in the field of psychiatry. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (2008). The court recognizes this general rule; however, as discussed above, Dr. Pitone's opinion is inconsistent with other substantial evidence of record. As a result, the ALJ properly accorded less weight to Dr. Pitone's opinion.

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 43 of 48   PageID#: 109

found no reason under the rules to review the ALJ's decision; thus, the ALJ's decision was affirmed, and Miller's request for review was denied. (R. at 6-9.) The Appeals Council noted that the additional evidence was considered, however, it was determined that the information did "not provide a basis for changing the [ALJ's] decision." (R. at 6.)

Pursuant to 42 U.S.C. § 405(g) sentence six,

> [this] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

According to the Supreme Court, "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand [than the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). Thus, in order for the court to properly grant a remand under sentence six of § 405(g), the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins*, 953 F.2d at 95-96. For the purposes of the this analysis, evidence is considered new "if it is not duplicative or cumulative." *See Wilkins*, 953 F.2d at 96. Furthermore, as stated in *Wilkins*, "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." 953 F.2d at 96; *see also Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985).

Case 2:07-cv-00056-GMW-PMS   Document 20   Filed 08/08/08   Page 44 of 48   Pageid#: 110

It is also imperative that good cause be shown for the failure to incorporate the new evidence into the record in a prior proceeding. Various courts have interpreted the "prior proceeding" language to include the ALJ stage of review, as well as the Appeals Council stage of review. *See Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. February 20, 2008) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."); *see also Ingram v. Astrue*, 496 F.3d 1253, 1269 (11th Cir. 2007) ("'[T]he question [under the sixth sentence] is not whether there is good cause for failure to present the evidence at the ALJ level, but rather for failure to present it at the administrative level, which includes the Appeals Council stage.'") (quoting *White v. Barnhart*, 373 F. Supp. 2d 1258, 1265 (N.D. Ala. 2005)).

Here, without addressing whether the additional evidence was new, material and related to the relevant time period, it is clear that the additional evidence presented to the Appeals Council was incorporated into the record. As such, this court is not permitted to remand pursuant to sentence six because the evidence was properly made a part of the record by the Appeals Council. *See Edwards*, 2008 U.S. Dist. LEXIS at *23; *Ingram*, 496 F.3d at 1269; *see also Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th Cir. 1992) ("[O]nce the evidence is submitted to the Appeals Council it becomes part of the record, thus it would not make sense to require [the claimant] to present good cause for failing to make it part of a prior proceeding's record.")

Lastly, Miller argues that the ALJ failed to pose a hypothetical question that conformed with his residual functional capacity finding. (Plaintiff's Brief at 13.) The ALJ determined that Miller retained the residual functional capacity to perform a

significant range of heavy work. (R. at 23.) He found that Miller could perform work at all exertional levels that required no more than minimal literacy. (R. at 20.) The ALJ also found that Miller was further restricted by the limitations noted in the expert testimony of Schacht and by the limitations noted by Hamilton and Tenison in Exhibit 8F. (R. at 22.) Miller contends that because the ALJ did not pose a hypothetical to the vocational expert that combined the limitations in Exhibit 8F and those referenced in Schacht's testimony, he essentially failed to present a proper hypothetical that fairly set forth all of Miller's impairments. (Plaintiff's Brief at 13.) This argument is without merit.

Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of the claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's findings as to the claimant's residual functional capacity is supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ. The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979).

The court recognizes that the ALJ failed to incorporate the limitations contained in Exhibit 8F and the limitations noted by Schacht in the same hypothetical question. (R. at 324-25.) Instead, the vocational expert was asked to consider the limitations in

-46-

separate questions, one referencing the limitations noted in Schacht's testimony and the other referencing the limitations noted by Hamilton and Tenison in Exhibit 8F. (R. at 324-25.) Although the ALJ should have combined the limitations into a single hypothetical, I am of the opinion that the failure to do so constitutes harmless error. Here, the ALJ asked the vocational expert to assume a hypothetical individual of the same age, education and work experience as Miller, who had no exertional limitations and who possessed the limitations noted by Schacht. (R. at 324.) The vocational expert indicated that such an individual would be able to perform work as a general laborer at every exertional level, noting that work as a general laborer existed in significant numbers in the regional and national economies. (R. at 324.) The ALJ then posed a second hypothetical question to the vocational expert, asking her to assume a hypothetical individual of the same age, education and work experience as Miller, who had no exertional limitations and who was restricted by the non-exertional limitations set forth in Exhibit 8F. (R. at 324.) The vocational expert opined that the limitations contained in Exhibit 8F would not have an impact on Miller's ability to perform gainful employment. (R. at 325.) As such, the fact that the limitations noted by Schacht and the limitations contained in Exhibit 8F were not included in the same hypothetical is of no consequence. Therefore, Miller's argument as to this issue must fail.

For the above stated reasons, I find that substantial evidence exists to support the ALJ's decision.

*IV. Conclusion*

-47-

For the foregoing reasons, Miller's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This _8th_ day of August 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:07-cv-00056-GMW-PMS Document 20 Filed 08/08/08 Page 48 of 48 Pageid#: 114